IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| JULIA McCREIGHT, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:19-cv-865-RAH-SMD |
| | ) | [WO] |
| AUBURNBANK, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Julia McCreight and Rebecca Wester, claim they were harassed by their supervisor, Mike King, at AuburnBank and then wrongfully terminated.[1] They later filed suit, alleging discrimination, retaliation, and harassment under Title VII, the Age Discrimination in Employment Act (ADEA), and the Alabama Age Discrimination in Employment Act (AADEA). The Defendants have moved for summary judgment on all claims asserted against them. For the reasons that follow, the motion is due to be granted.

## I.    BACKGROUND

Julia McCreight and Rebecca Wester were long-term employees at AuburnBank until their terminations. At the time of their terminations, McCreight was a mortgage loan originator (MLO), and Wester was a loan processor and closer.

---

[1] AuburnBank and Auburn National Bancorporation, Inc. will be collectively referred to as AuburnBank.

As an MLO, McCreight originated loans for AuburnBank.  McCreight would also pre-qualify applicants, usually on the basis of unverified information provided by the applicants.  Once an applicant is pre-qualified, underwriters will vet the applications and decide whether the applicant should be formally approved for a loan. Because MLOs like McCreight do not verify any of the information they receive from applicants, MLOs simply are not authorized to underwrite, approve, or close loans; rather MLOs pre-qualify applicants at the front-end of the loan process. Approval and closing are tasks reserved for loan processors and closers, like Wester. (*See* Doc. 125 at 30–37.)

In 2016 and 2017, AuburnBank hired two new employees that would catalyze the events surrounding this case: Mike King and April Herring.  Herring was hired in 2016 and was quickly promoted to Operations Manager.  About a year later, in September 2017, Mike King was hired as the Mortgage Department Manager.  King oversaw the entire mortgage department at AuburnBank and was tasked with growing and revitalizing the department, which had been in decline for several years. (Doc. 125 at 36–39.) King quickly developed a positive relationship with Herring, who he viewed as a partner in his efforts to improve the department. (Doc. 121-10 at 7.) At the time King was hired, he was 60 years old. (*Id.* at 4.)

King brought a new management style to AuburnBank, declaring at one of his first meetings that he was not there to "make friends, he was there to clean house

and clean up the mortgage department." (Doc. 121-22 at 8.) King also stated that "he wanted to hire younger MLOs" to target the post-college mortgage market. (Doc. 121-13 at 22, 26.)

McCreight and Wester immediately had problems with King, who they allege engaged in a campaign of harassment against them.

## A.    Harassment

This harassment, according to McCreight, included the following conduct: King chastised McCreight for using "loud language" in an email to a co-worker (Doc. 121-13 at 11); King told McCreight that he would fire her on the spot if she made a mistake (*id.*); Herring told McCreight that given her experience "she should know better" than to make simple mistakes (Doc. 122-14 at 186); King and Herring allegedly spread a false rumor that McCreight had sued AuburnBank in the past (Doc. 122-14 at 133); McCreight was not "given the courtesy" of an invitation to a job fair (Doc. 121-13 at 24); on one occasion, King introduced McCreight last at a meeting—despite her seniority—and said that "everyone knows Julia because she's been here forever" (*id.* at 23); and King routinely ignored McCreight's emails and efforts to communicate with him (*id.* at 11, 14, 31).

McCreight claims that she complained about King's treatment in two ways. First, McCreight complained to Laura Carrington, Vice President of Human Resources, on November 2, 2017, alleging that she was the "victim of age

3

discrimination and/or age harassment" and "gender discrimination and/or gender harassment" by King. (Doc. 121-13 at 34.) Second, McCreight claims she complained to Senior Vice President Terry Bishop once per month after King was hired, although Bishop disputes this. (*Id.* at 36.) McCreight states that she told Bishop that King "was wanting to hire young originators and get rid of the older female originators." (*Id*.) However, nothing ever came of any of McCreight's harassment complaints. (Doc. 122-29 at 2; Doc. 122-31 at 2.)

Bishop and Carrington deny ever telling King or Herring, or any decisionmaker in McCreight's subsequent termination, about any discrimination or harassment complaints by McCreight. (*Id.*)

Like McCreight, Wester also alleges harassment from King, and to some extent from Herring. From September 2017 until her ultimate termination in April 2019, Wester claims that King would "talk down" to her and interrupt her. (Doc. 121-22 at 8–9.)  According to Wester, this conduct began at the outset because, in one of Wester's first meetings with King, King "accused" Wester of "things that weren't true, put [Wester] on probation . . . and kept telling [Wester] that he would fire [her] on the spot if [she] did certain things." (*Id*. at 8.) Furthermore, Wester's performance reviews declined immediately after King was hired (Doc. 131 at 89.)

Like McCreight, Wester also claims that she complained to Carrington. Two days before Wester was fired, in April 2019 (a year after McCreight was fired),

Wester claims that she went to Carrington and complained about a hostile work environment and that she felt like she would be the next older woman to be fired by King. (Doc. 121-22 at 58.) Like with McCreight's complaints, Carrington denies ever receiving a discrimination or harassment complaint about King from Wester. (Doc. 122-31 at 2–3.)

## B.    Terminations

Under King's leadership, the mortgage department underwent many personnel changes, including the following:

| Date | Name | Employment Decision | Employee Age at Time of Decision | Gender |
|---|---|---|---|---|
| 9/25/2017 | Jamie McConnell | Hired | 31 | Female |
| 1/4/2018 | Celeste Smith | Transferred to part time MLO | 21 | Female |
| 1/12/2018 | Winston Smith | Hired | 22 | Male |
| 1/26/2018 | Mary Sandlin | Terminated | 61 | Female |
| 3/08/2018 | Audra Prather | Terminated | 44 | Female |
| 3/19/2018 | William Alderman | Hired | 21 | Male |
| 4/09/2019 | Jamie McConnell | Promoted | 31 | Female |
| 5/04/2018 | Julia McCreight | Terminated | 61 | Female |
| 5/31/2018 | Celeste Smith | Made full time | 21 | Female |
| 6/01/2018 | William Alderman | Made full time | 21 | Male |
| 9/24/2018 | Chip Corley | Hired | 55 | Male |
| 10/01/2018 | Jay Hover | Hired | 39 | Male |
| 10/01/2018 | Jon Sonmor | Hired | 63 | Male |
| 4/01/2019 | Melissa Tilley | Transferred | 60 | Female |
| 4/16/2019 | Darlene Harrelson | Transferred | 66 | Female |
| 4/26/2019 | Rebecca Wester | Terminated | 65 | Female |

(Doc. 122-35 at 12.)

These decisions included (1) the termination of four women over the age of 40, including McCreight (age 61) and Wester (age 65); (2) the transfer of two women; (3) the hiring and promotion of one woman who was 31 years-old, and (4) the hiring of five men. No men were terminated or transferred.

According to AuburnBank, McCreight's termination came because of repeated inexcusable mistakes.  This began in April 2018, when McCreight bound AuburnBank to an interest rate on a loan well below what McCreight was authorized to issue by regulation and AuburnBank policy, thereby resulting in a losing loan to AuburnBank. (Doc. 122-35 at 9–10.) King met with McCreight about the issue and warned her that a similar loss on future loans would result in McCreight's termination. (Doc. 122-2 at 16.)

Following this warning, King discovered that McCreight had approved and bound, without authorization, AuburnBank to another bad loan. (Doc. 122-26 at 27; Doc. 121-13 at 183.) McCreight's fault stemmed from sending a letter to an applicant that stated he was "approved" for a loan, as opposed to "pre-qualified" or "pre-approved." (Doc. 122-2 at 54.) Upon finding out about McCreight's approval of the bad loan, King gave McCreight the opportunity to resign or be terminated. McCreight refused to resign, and therefore King terminated her. No other MLOs approved a loan without proper authorization.

6

A year after McCreight's termination, Wester was terminated. (Doc. 121-22 at 239.)  According to AuburnBank, April Herring made the initial decision to terminate Wester, and King approved it. (Doc. 121-22 at 158; Doc. 121-10 at 17.) Wester was informed of her termination on April 26, 2019, when she was called into a meeting with Carrington and Herring and was told that she had closed a loan without having verified the borrower's employment, a violation of bank policy. (Doc. 121-22 at 239.) According to AuburnBank, had Wester verified the applicant's employment, she would have discovered that the applicant was no longer employed, and therefore AuburnBank would not have closed on the loan. This incident apparently was the final straw, as Wester had failed to verify employment on prior occasions, including in 2016, and had just survived a probationary period for performance-related issues. (*Id*.; Doc.122-21 at 85.) Wester was replaced by Laura Jones, a fifty-four-year-old female. No one else at AuburnBank closed a loan without verifying the borrower's employment. No other employees failed to verify employment before closing.

## II.    <u>The Present Litigation</u>[2]

In the Complaint, McCreight brings four counts, two of which contain several claims within:

---

[2] The Amended Complaint (Doc. 13) also brings Count IV (intentional infliction of emotional distress), Count V (invasion of privacy), and Count VI (tortious interference with contractual relations). A prior opinion of this Court dismissed Counts IV and VI. (Doc. 25.) Wester voluntarily dismissed her invasion of privacy claim in Count V. (Doc. 131 at 96.)

- Count I—Sex Discrimination, Harassment, and Retaliation Against Defendants AuburnBank and Auburn National Bancorporation, Inc. in violation of Title VII;

- Count II—Age Discrimination, Harassment, and Retaliation Against Defendants AuburnBank and Auburn National Bancorporation, Inc. in violation of the ADEA and AADEA;

- Count V—Invasion of Privacy Against All Defendants

- Count VII—Negligent and Wanton Hiring, Training, Supervision, and Retention Against All Defendants

Wester brings two counts:

- Count III—Age Discrimination, Harassment, and Retaliation Against AuburnBank and Auburn National Bancorporation, Inc. in violation of the AADEA;

- Count VII—Negligent Hiring, Training, and Retention Against All Defendants

### III.   JURISDICTION AND VENUE

Subject matter jurisdiction is conferred by 28 U.S.C. § 1331 as to the federal causes of action, and the Court may exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.   The parties do not contest personal

jurisdiction or venue, and there are adequate allegations to support both. *See* 28 U.S.C. § 1391.

## IV.   STANDARD OF REVIEW

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a), (c).  No genuine issue of material fact exists if the opposing party fails to make a sufficient showing on an essential element of her case as to which she would have the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Just as important, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986).  In making this assessment, the Court must "view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc*., 117 F.3d 1278, 1285 (11th Cir. 1997) (citation omitted), and "resolve all reasonable doubts about the facts in favor of the non-movant," *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am*., 894 F.2d 1555, 1558 (11th Cir. 1990) (citation omitted).

## V.   DISCUSSION

**A.      Title VII Discriminatory Terminations (Count I)[3]**

In Count I, McCreight brings a sex discrimination termination claim under Title VII.  McCreight's Title VII claim alleges that "she was discriminated against both because she was older **and** a woman." (Doc. 131 at 51.)  That is, McCreight brings an "intersectional" or "sex-plus-age" claim. *See Mosley v. Alabama Unified Jud. Sys., Admin. Off. of Cts.*, 562 F. App'x 862, 866 (11th Cir. 2014) (holding intersectional claims viable under Title VII).

The first consideration is whether McCreight brings a single-motive or mixed-motive discrimination claim because McCreight's Complaint and subsequent briefing offer contrasting suggestions at different points in time.[4] For example,

---

[3] Wester did not plead a Title VII claim in the Complaint. But now, at summary judgment, Wester attempts to assert such a claim through her briefing. (Doc. 131 at 63.) This she cannot do, as she cannot "raise new claims at the summary judgment stage." *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1314–15 (11th Cir. 2004).

[4] "Mixed-motive and single-motive discrimination are different theories of discrimination, as opposed to distinct causes of action. Specifically, they serve as alternative causation standards for proving discrimination." *Quigg v. Thomas County School Dist.*, 814 F.3d 1227, 1235 n.4 (11th Cir. 2016). Mixed-motive claims exist when the plaintiff alleges that the adverse action taken against her was motivated by both a legal *and* an illegal reason, whereas a single-motive, or pretext, claim alleges that the adverse action was taken solely pursuant to an illegal, discriminatory motive. *Id.* at 1235.

While both single-motive and mixed-motive claims are avenues to establish discrimination, the two theories require courts to engage in different analyses at summary judgment. Of course, both mixed and single motive theories can be established through either direct or circumstantial evidence. *Smith v. Vestavia Hills Board of Education*, 791 F. App'x 127, 130 (11th Cir. 2019). However, "single-motive cases based on circumstantial evidence are primarily evaluated under the *McDonnell Douglas* burden-shifting framework," whereas mixed-motive cases are not evaluated under *McDonnell Douglas*. Instead, mixed-motive cases require only a two-pronged showing "that the (1) employer took an adverse employment action against her, and (2) a protected characteristic was a motivating factor for that decision." *Id.*; *see also Quigg,* 814 F.3d at 1240 (outlining mixed-motive test).

McCreight argues that AuburnBank had no legitimate or legal motive to fire her, thereby suggesting a single-motive theory. But in her responsive briefing at summary judgment, McCreight ignores AuburnBank's *McDonnell Douglas* arguments, instead arguing for application of a mixed-motive test for cases where the employer had both a legitimate and illegitimate motive for its employment action. Essentially, McCreight appears to assert a single-motive claim under the mixed-motive test.[5]

The Eleventh Circuit's decision in *Smith v. Vestavia Hills Board of Education* gives instruction on how to proceed. 791 F. App'x 127 (11th Cir. 2019). There, the Eleventh Circuit held that a single-motive framework was appropriate where a plaintiff did not "plead" a mixed-motive case or "suggest that unlawful bias, *in addition to other factors*, motivated the adverse actions. . . Rather, she present[ed] a pretext case and claims that unlawful bias was the true reason for her termination." 791 F. App'x at 131 (emphasis added). The same is true here. McCreight did not plead a mixed-motive claim, she never explicitly mentions mixed-motives in her briefing, and she argues that AuburnBank's proffered reasons for firing her are

---

[5] It does not take a tea-leaf reader to understand why McCreight adopted this approach. The mixed-motive test is more employee friendly as it avoids the burdensome pitfall of identifying "similarly situated" comparators under the *McDonnell Douglas* framework. So, a plaintiff may prefer the mixed-motive test. However, while wanting the mixed-motive *test,* plaintiffs may not desire to bring a mixed-motive *claim* because, unlike single-motive claims, mixed motives claims do not allow for actual damages, only attorneys' fees and declaratory relief. 42 U.S.C. § 2000e–5(g)(2)(B); *see also Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1242 (11th Cir. 2016). In essence, McCreight is attempting to mish-mash frameworks so that she can have an easier test while retaining full damages.

pretextual. Outside of citing the mixed-motive two-pronged *test* (without asserting that there were multiple motives), McCreight does not even make a "passing reference" to a mixed-motive theory. *Id*. (quoting *Keaton v. Cobb County*, No. 08-11220, 2009 WL 212097, at *10 (11th Cir. Jan. 30, 2009)). Therefore, the appropriate framework on which the Court will proceed is under a single-motive theory analyzed under the *McDonnell Douglas* and "convincing mosaic" tests. *Id.*

### 1. *McDonnell Douglas*

"Where . . . an employee puts forth only circumstantial evidence in support of [her] discriminations claims, the *McDonnell Douglas* framework generally applies." *Id*. (quoting *Benjamin v. SNF Holding Co.*, 602 F. App'x 758, 762 (11th Cir. 2015) (internal quotations omitted).   Under the *McDonnell Douglas* framework, "the plaintiff bears the burden of establishing a prima facie case of race discrimination by demonstrating that: (1) [she] belongs to a protected class; (2) [she] suffered an adverse employment action; (3) [she] was qualified to perform the job in question and (4) [her] employer treated 'similarly situated' employees outside [her] class more favorably." *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022) (citing *Lewis v. City of Union City*, 918 F.3d 1213, 1220 – 21 (11th Cir. 2019) (en banc)).

Applying this framework, the Court concludes that McCreight has failed to carry her burden on the fourth prong (comparators) — whether AuburnBank treated similarly situated employees outside McCreight's protected class more favorably.

12

While McCreight contends that she does not have to establish comparators under *McDonnell Douglas*, McCreight later argues that AuburnBank treated three men more favorably than her: Barry Bryant, Jon Sonmor, and Chip Corley. AuburnBank disputes this assertion.

For Title VII purposes, a proper comparator is (1) engaged in the same basic conduct, (2) subject to the same employment policies, guidelines, and rules, (3) under the jurisdiction of the same supervisor, and (4) shared similar employment or disciplinary histories. *Lewis*, 918 F.3d at 1226.

Bryant is not a proper comparator because he was a relatively new hire with less than two years of experience with no disciplinary history for approving a loan without proper authorization whereas McCreight had over 25 years of experience and had previously been disciplined for an unauthorized approval. *See id.* at 1228 (explaining that "differences in experience and disciplinary history can disqualify a plaintiff's proffered comparators." (quoting *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 304 (6th Cir. 2016)). Likewise, Sonmor is not a proper comparator because he did not engage in the same basic conduct as McCreight; that is, approving a loan without authorization.[6] Finally, Corley is not a proper comparator because

---

[6] Mortgage lending is a highly regulated industry, and mortgage loan originators are highly regulated positions. *See, e.g.*, the SAFE Mortgage Licensing Act, 12 C.F.R. Part 1008. Alabama Code § 5-26-1, et seq. Because mortgage loan originators solicit prospective borrowers for their employer and oftentimes have incentive-driven compensation programs, the industry generally leaves underwriting and approval to other employees, whose compensation is not directly tied to the approval or denial of a loan.

both Corley and McCreight were treated the same; that is, after making costly mistakes, they were both disciplined the same—resign with severance or be terminated. The only distinction is that Corley decided to resign, and McCreight decided not to. And in any event, like with Sonmor and Bryant, Corley also never approved a loan without authorization.

The Court concludes McCreight has failed to establish proper comparators under the fourth prong of the *McDonnell Douglas* framework, a burden she invokes by application but not by name, and therefore her sex discrimination claim must fail under that method of analysis.

### 2.  Convincing Mosaic

McCreight also argues that she has established discrimination through a "convincing mosaic" of evidence, a point AuburnBank disputes.[7]  "A triable issue of fact exists if the record, viewing in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Jenkins*, 26 F.4th at 1250 (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)).  A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates "(1) suspicious timing, ambiguous statements, or other information from which

---

[7] While McCreight brings this argument under the banner of the mixed-motive test, because she explicitly advocated for the existence of a convincing mosaic, the Court will view this argument as if it was brought under the appropriate single-motive banner.

discriminatory intent may be inferred, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Id*. (quoting *Lewis II*, 934 F.3d at 1185) (internal quotations omitted).

When considering the record, the Court concludes that McCreight has not presented sufficient evidence of a convincing mosaic. First, McCreight does not present any evidence of "suspicious timing" or "ambiguous statements." McCreight was fired immediately after King discovered that she had approved a loan without authorization—an infraction that McCreight had previously been warned about. And King has never wavered in his reasoning for terminating McCreight; he has always consistently and unambiguously asserted that she was fired for approving the bad loan without authorization. *Cf. Jenkins*, 26 F.4th at 1251 (relying on the decisionmaker's "shifting reasons" for terminating an employee to establish a convincing mosaic).

Second, McCreight has not shown that there was "systemically better treatment of similarly situated employees" outside of McCreight's protected class. *Jenkins*, 26 F.4th at 1250. As discussed above, McCreight has failed to introduce evidence of better treatment of similarly situated men.  McCreight does highlight evidence of King's treatment of other older women in general, and in particular, King's termination of four women while hiring five men. While this statistic is "relevant and important . . . statistics alone cannot make a case of individual

15

disparate treatment." *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1132 (11th Cir. 1984). This is especially true considering McCreight's inability to produce evidence of "systemically better treatment of similarly situated employees" outside of her protected class. *Jenkins*, 26 F.4th at 1249.

And finally, the pretext prong of the convincing mosaic test is fatal to McCreight's mosaic theory. In the convincing mosaic analysis, "[a] plaintiff can show pretext by: (i) casting sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered reasons were not what actually motivated its conduct, (ii) showing that the employer's articulated reason is false and that the false reason hid discrimination, or (iii) establishing that the employer has failed to clearly articulate and follow its formal policies." *Lewis,* 934 F.3d at 1186. She must do more than arguing that the employer's reasons are false; she must establish that discrimination was the real reason for her termination.

Simply put, McCreight fails to present sufficient evidence tending to show that AuburnBank's purported reason for firing her is a false stand-in for the true reason—discrimination.  Indeed, McCreight barely attempts to cast doubt on King's reason for firing her.  In contrast to McCreight's lack of evidence regarding the legitimacy of her termination, AuburnBank has provided a clear, detailed explanation for why McCreight was terminated; that is, McCreight bound

AuburnBank to a loan it did not want and without authorization, a type of infraction for which McCreight had been previously warned.[8]

All told, McCreight has failed to meet AuburnBank's reason "head on and rebut it" by demonstrating "weaknesses, implausibility, inconsistences, incoherencies, or contradictions in the employer's rationale." *Holland,* 677 F.3d 1047, 1055–56 (11th Cir. 2012); *see also Sims*, 704 F.3d at 1334 (presenting "virtually no evidence of age bias on the part of [the decision-maker] who was 61 himself at the time."). Failing to establish pretext, suspicious timing, ambiguous statements, or systemically better treatment of other employees, McCreight's mosaic is insufficiently convincing to "create a triable issue concerning the employer's discriminatory intent." *Jenkins*, 26 F.4th at 1250.   Accordingly, summary judgment is due to be granted on Count I.

## B.  ADEA and AADEA Age Discrimination Claims

Both McCreight and Wester have brought claims alleging that they were terminated because of their age. The Court will address both in turn.

### 1.  McCreight's Age Discrimination Claims (Count II)

---

[8] King sent an email to a co-worker stating, in part, as follows: "This was a loan that should have never been made. The borrower came in and was approved by Julia. His income was from tips while working as a bartender at the Marriott. In addition, he had only been on the job 6 months . . . He did not qualify for the loan. I met with him prior to Julia leaving and was in the process of explaining why he didn't qualify when he asked me 'What bout my approval letter that Julia gave me?' . . . [Julia] issued the letter prior to any loan processing. The appraisal nor credit report weren't even ordered. Literally, she approved him on the day he walked into our office. I spoke with Marla and she agreed we had no choice but to close the loan. He had signed a contract . . . . Everything in this file was questionable . . . . This was the final straw for me. This file is why Julia was terminated."(Doc. 122-26 at 27.)

The Court turns to McCreight's claim of age discrimination under the ADEA and AADEA,[9] which AuburnBank challenges in its summary judgment motion.

The ADEA and AADEA prohibit employers from discriminating against employees who are forty years or older because of their age. 29 U.S.C. § 623(a)(1); Ala. Code §25-1-20. To assert an action under the ADEA and the AADEA, an employee must establish that her age was the "but-for" cause of the adverse employment action. *Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 176 (2009). This showing can be made through either direct or circumstantial evidence. *Mora,* 597 F.3d at 1204. When an ADEA/AADEA claim is based on circumstantial evidence, the Court applies the framework established in *McDonnell Douglas*. *See Sims,* 704 F.3d at 1332; *Lambert v. Mazer Disc. Home Centers, Inc.*, 33 So. 3d 18, 23 (Ala. Civ. App. 2009).

McCreight does not attempt to make her ADEA/AADEA claim based on direct evidence; instead, she relies upon circumstantial evidence, thereby implicating the *McDonnell Douglas* framework.  The Court dispenses with examining whether McCreight can make a prima facie case of age discrimination because the pretext analysis is dispositive.

---

[9] Alabama state courts have adopted the same burden-shifting analysis applied to federal age-discrimination claims brought under the ADEA for the AADEA.  *Lambert v. Mazer Disc. Home Centers, Inc.*, 33 So. 3d 18, 23 (Ala. Civ. App. 2009) (citing *Robinson v. Alabama Cent. Credit Union*, 964 So. 2d 1225, 1228 (Ala. 2007)).

Time and again in its briefing, AuburnBank reiterates some variation of its theme: McCreight was fired for an unauthorized loan approval on a loan that AuburnBank would not otherwise have approved. Accordingly, McCreight bears the burden of showing that this asserted reason was pretextual and that, based on sufficient evidence, a jury "could reasonably find that [she] would not have been fired but for [her] age." *Keller*, 513 F. Supp. 3d at 1334.

In addition to the same evidence as to her sex discrimination claim, McCreight points to two more categories of evidence: (1) "ageist comments" made by King, the decisionmaker; and (2) younger employees' mistakes were treated less harshly.   As to the ageist comments, McCreight points to King's statement that "he wanted to hire younger MLOs" in order to target the post-college mortgage market and that he wanted to "clean house and clean up the mortgage department."   These comments do little to establish that King acted with improper discriminatory animus when he terminated McCreight for violating company policy. These stray comments, at worse, indicate a desire to attract young people to the company, not to terminate older employees. *See, e.g., Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 326 (6th Cir. 2021) ("A stated desire to 'attract young people . . . says *nothing* about terminating older employees . . . hiring young [bankers] does not require the termination of older employees."), *cert. denied sub nom. Pelcha v. Watch Hill Bank*, 142 S. Ct. 461, 211 L. Ed. 2d 281 (2021).  McCreight offers no statements by King or anyone else to the

effect that McCreight was too old.  *See, e.g.*, *Wright v. Southland Corp.*, 187 F.3d 1287, 1304 (11th Cir. 1999) (finding triable issue of discrimination where decision maker commented that he wanted to hire younger employees *and* commented that the plaintiff was "too old").

Comments aside, McCreight attempts to rebut the proffered reason by arguing that she was treated differently from six younger employees.[10] An examination of the record reveals this not to be the case. Two of them were not even employed at AuburnBank during King's tenure,[11] and further, none of them ever, while employed as an MLO, sent a loan approval letter to an applicant without proper authorization. Therefore, it cannot be said that these employees were treated differently in a way that shows that McCreight was fired because of her age. *See Lewis*, 918 F.3d at 1227.

After careful review, the Court concludes that McCreight has failed to demonstrate pretext, or that age bias was the "but-for" cause of King's termination decision. AuburnBank's motion for summary judgment on Count II is due to be granted.

## 2.  Wester's Age Discrimination Claims (Count III)

Wester also alleges that she was terminated because of her age, a claim she supports by circumstantial evidence.  The Court concludes that she has sufficiently

---

[10] Celeste Smith, William Alderman, Jamie McConnell, Barry Bryant, Drew Goodner, and Blake Otwell. (Doc. 131 at 75.)

[11] Drew Goodner and Blake Otwell were never supervised by King. (Doc. 138 at 37.)

made a prima facie case because (1) Wester is over forty; (2) she was terminated; (3) she was replaced by Laura Jones, who is ten years Wester's junior;[12] and (4) she was qualified to be a loan processor and closer.

Having established a prima facie case, the burden shifts to AuburnBank to rebut the presumption of discrimination with evidence of a legitimate, nondiscriminatory reason for the adverse employment action. Here, AuburnBank asserts that Wester was fired because she closed a loan without verifying the applicant's employment status. Accordingly, the burden shifts back to Wester to show that this asserted reason was pretextual.

Wester's briefing as to pretext is a mirror image of those arguments made on behalf of McCreight. Indeed, counsel briefed McCreight and Wester's pretext section as one, relying on the same evidence and the same argument for both Plaintiffs. This evidence was insufficient to rebut the legitimate reason for McCreight's termination, and it is equally lacking as it relates to Wester. In fact, the referenced comments by King are even more tenuous in Wester's circumstance because King's comments were made in September 2017 and Wester was not

---

[12] The Eleventh Circuit has held that an age difference as little as 3 years is "substantially younger" for establishing replacement comparators in a plaintiff's prima facie ADEA showing. *See Carter v. DecisionOne Corp. Through C.T. Corp.,* 122 F.3d 997 (11th Cir. 1997) (explaining that the Eleventh Circuit has found a three-year age difference to be "legally significant for ADEA purposes"); *see also Carter v. City of Miami,* 870 F.2d 578, 582–83 (11th Cir. 1989) (finding that a *prima facie* ADEA case was established when a 49–year–old plaintiff was replaced by a 46–year–old woman).

terminated until over 18 months later in May 2019.  Lacking temporal proximity, there is little to connect King's comments to Wester's termination. *See Ritchie v. Indus. Steel, Inc.,* 426 F. App'x 867, 873 (11th Cir. 2011) ("[S]tray remarks that are 'isolated and unrelated to the challenged employment decision' are insufficient to establish pretext.").

Further, the alleged differential treatment of other employees is also even more unpersuasive in Wester's case. Where McCreight at least highlighted the treatment of other MLOs, the same position McCreight held, Wester does not point to any other loan closers to support her position about a discriminatory termination. Rather, Wester attempts to compare the treatment of MLOs to her own treatment as a loan closer. This form of comparison is inadequate, especially when no other loan closer or MLO committed the same mistake for which Wester was fired.

The Court concludes that Wester has failed to present sufficient evidence to demonstrate that AuburnBank's reason for firing her was pretextual. Summary judgment is due to be granted AuburnBank on Count III.

## C.    Retaliation (Counts I, II and III)

McCreight and Wester also allege in Counts I, II and III, in the alternative to being fired because of their age or sex, that they were fired because they complained about discrimination and harassment. Under both Title VII and the ADEA/AADEA, a plaintiff's prima facie case for retaliation is the same. *Bonham v. Regions Mortg.,*

*Inc.*, 129 F.Supp.2d 1315, 1321 (M.D. Ala. 2001) ("And, because it is self-evident that the AADEA's purpose and prohibition are like the ADEA's . . . it follows that [Title VII] principles should govern the AADEA as well.") (citing *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc)).

Plaintiffs must show that: (1) they engaged in protected activity; (2) they suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (quoting *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)). Of these elements, McCreight and Wester's claims fail to present sufficient evidence to establish that there was a causal connection between the protected activity and their subsequent terminations.

### 1. McCreight

McCreight alleges that King fired her because McCreight had complained about King to Laura Carrington, Vice President of Human Resources, and to Terry Bishop, Senior Vice President.  AuburnBank argues that McCreight did not engage in protected activity, and even if she did, there is no causal link between that activity and her subsequent termination.  In response, McCreight contends that she has at least created a dispute of fact as to all three prongs of her retaliation claim.

Generally, complaints of discrimination to a supervisor constitute protected activity. *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507

(11th Cir. 2000). However, an employee's complaint must "at the very least, communicate her belief that discrimination is occurring to the employer, and cannot rely on the employer to infer that discrimination her occurred." *Demers v. Adams Homes of Nw. Fla., Inc.,* 321 F. App'x 847, 852 (11th Cir. 2009) (quoting *Webb v. R & B Holding Co., Inc.*, 992 F. Supp. 1382, 1390 (S.D.Fla.1998)). "A complaint about an employment practice constitutes protected opposition only if the individual explicitly or implicitly communicates a belief that the practice constitutes unlawful employment discrimination." *Murphy v. City of Aventura*, 383 F. App'x 915, 918 (11th Cir. 2010) (citing EEOC Compl. Man. (CCH) §§ 8–II–B(2) (2006)) (internal quotations omitted); *see also Jeronimus v. Polk Cty. Opportunity Council, Inc.,* 145 F. App'x 319, 326 (11th Cir. 2005) (holding that an employee's email complaint that he was "being 'singled out,' subjected to 'a campaign of harassment,' and working in a 'hostile environment'" was not protected activity because the employee "never suggested that his treatment was in any way related to his race or sex.").

McCreight alleges she engaged in protected activity in two ways. First, McCreight complained to Carrington on November 2, 2017 that false rumors were being spread about her and that she was "the victim of age discrimination and/or age harassment" and "gender discrimination and/or gender harassment." (Doc. 121-13 at 34.) Second, McCreight claims she complained to Bishop once per month after

King was hired and told him that King "was wanting to hire young originators and get rid of the older female originators." (*Id.* at 36.)

AuburnBank disputes these assertions, stating that McCreight did not mention harassment or discrimination during any of these conversations with Carrington or Bishop nor did she put these alleged complaints in writing, but rather only complained about the false rumors being spread about her.

AuburnBank's skepticism aside, McCreight's testimony is sufficient to create a disputed issue of fact as to whether she engaged in protected activity, especially since the Court must view the evidence in the light favorable to McCreight. That she may have voiced a complaint about discrimination orally, rather than in an email or in writing, is without relevance. *See Knox v. Roper Pump Co.*, 957 F.3d 1237, 1245 (11th Cir. 2020) (holding that a verbal complaint of discrimination to an internal ethics hotline was clearly protected activity).

But that is not the end of the inquiry, as AuburnBank also argues that McCreight cannot show causation because (1) there is no temporal proximity between McCreight's complaints and her termination and (2) the decisionmakers who fired McCreight were unaware that she had previously lodged any complaints of discrimination. The Court agrees on the second account, and therefore pretermits any discussion as to the temporal proximity issue.

Both ADEA/AADEA and Title VII retaliation claims require proof that "the protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar,* 570 U.S. 338, 343 (2013). "Stated another way, a plaintiff must prove that had she not complained, she would not have been fired." *Jefferson*, 891 F.3d at 924.

And here, McCreight's claimed pattern of antagonism could potentially establish causation *if* there was evidence that either King or Herring actually knew about McCreight's previous complaints to Carrington or Bishop. But here, McCreight presents no such evidence. All the decisionmakers have explicitly denied knowing about McCreight's prior complaints, and there is no evidence in the record showing or inferring that Carrington told King or Herring, or any other decisionmaker, that McCreight had complained about discrimination or harassment.[13] *See Singleton v. Pub. Health Tr. of Miami-Dade Cty.,* 725 F. App'x 736, 738 (11th Cir. 2018) (affirming summary judgment where plaintiff failed "to establish that both the decisionmaker responsible for each alleged adverse action had knowledge of his protected activity and the decision-maker's knowledge was

---

[13] McCreight argues that because Carrington told King and Herring that McCreight had complained to Carrington about the false rumors, that an inference is warranted that Carrington also told King and Herring that McCreight had also complained about sex or age discrimination. However, no such inference is warranted. Evidence that Carrington told decisionmakers about one complaint is not evidence that Carrington told the decisionmakers about a different complaint altogether. This is especially true when Carrington, Herring, and King all deny that Carrington informed them that McCreight had voiced a complaint of discrimination.

acquired in close temporal proximity to the adverse action."); *Hurlbert v. St. Mary's Health Care Sys., Inc.,* 439 F.3d 1286, 1298 (11th Cir. 2006) (explaining that there is no causal connection between protected activity and adverse action where there is "unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct.").

Because there is no evidence, direct or circumstantial, that the individuals who fired McCreight were aware that she had previously complained about discrimination or harassment, McCreight has not established that she was fired because of protected activity.

### 2.  Wester

AuburnBank raises similar challenges with Wester's retaliation claim, and therefore seeks summary judgment on Counts I, II and III as applicable to her.   And like with McCreight, there is a genuine dispute of fact as to whether Wester engaged in protected activity. Two days before she was fired, Wester claims to have complained about a hostile work environment to Carrington, telling Carrington that she felt targeted and that she would be the next older woman to be fired under King. A reasonable juror could conclude that Wester's complaint to Carrington sufficiently "communicate[d] [Wester's] belief that discrimination is occurring," even in the absence of the buzzwords "age discrimination," "age harassment," or "age retaliation." *Demers*, F. App'x at 852.

Nonetheless, like McCreight's claim, Wester's retaliation claim fails because she has presented insufficient evidence showing that the decisionmakers who fired her were aware that Wester had complained about discrimination to Carrington. Here, Herring and King made the decision to terminate Wester. No evidence has been presented showing that Herring and King were aware that Wester had previously complained about discrimination. In fact, the evidence shows the opposite, as Carrington denied telling Herring or King about Wester's complaints and Herring and King deny having any knowledge that Wester ever complained about her work environment.

Still, Wester may still be able to establish a decisionmaker's awareness through "circumstantial evidence," but not through "unsupported inference." *Martin*, 959 F.3d at 1053. As to circumstantial evidence, Wester points to the fact that Carrington and Herring spoke between the time that Wester complained to Carrington and when Herring terminated Wester two days later.  But this evidence only shows that Carrington "had an opportunity to tell" Herring about Wester's complaint, it does not show "that she actually did." *Martin*, F.3d at 1054. Without more evidence, and in the face of both Carrington and Herring's unrebutted denials that Carrington told Herring about Wester's complaint, Carrington's "opportunity to tell is not a substitute for evidence that she did so." *Id*. To conclude otherwise would be pure speculation. *Id*.

28

In the absence of evidence showing that King or Herring knew of Wester's protected activity, Wester is unable to establish causation and her retaliation claim fails.

**D.     Hostile Work Environment (Counts I, II and III)**

In Counts I, II and III, McCreight and Wester also claim that they were subject to a hostile work environment based on sex. Hostile work environment claims, whether under the ADEA/AADEA or Title VII, require a plaintiff to show that "(1) she belongs to a protected group, (2) she has been subject to unwelcome harassment, (3) the harassment was based on a protected characteristic, (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatory abusive working environment, and (5) the employer is responsible for such environment under either a theory of vicarious or of direct liability." *Smith v. Naples Community Hosp., Inc.*, 433 F. App'x 797, 799 (11th Cir. 2011) (citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)).

AuburnBank argues that McCreight and Wester cannot meet the third and fourth elements of their prima facie cases — that is, that they were harassed because of a protected characteristic like age or gender and that the alleged harassment was sufficiently severe or pervasive to have altered the terms and condition of employment.

Whether harassment is "severe or pervasive" requires consideration of both subjective and objective components. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22 (1993). That is, to be actionable, the alleged harassing conduct "must result in both an environment 'that a reasonable person would find hostile or abusive' and an environment that the victim 'subjectively perceive[s] . . . to be abusive." *Miller*, 277 F.3d at 1276 (quoting *Harris*, 510 U.S. at 21–22).  Courts consider four factors when determining whether the conduct was objectively severe or pervasive: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1246 (11th Cir. 1999).  These factors are considered in the totality of the circumstances. *Guthrie v. Waffle House, Inc.*, 460 F. App'x 803, 806 (11th Cir. 2012).

After extensively reviewing the record,[14] and parsing through the Plaintiffs' brief which lumps together facts related to both McCreight and Wester's harassment claims, it appears that McCreight's hostile work environment claim is based on the following conduct:

---

[14] McCreight's briefing alleges other harassing conduct, however, this other "harassment" is, at best, inaccurate, and at worst, intentionally disingenuous. For example, McCreight argues that she was harassed when she was excluded from networking events and social media opportunities.  To support this proposition, McCreight cites to Doc. 122-14 at 129–130. However, that citation leads to an email from Mary Sandlin, not McCreight, complaining about being excluded from a networking event at Auburn University.

- In October 2017, during McCreight's first meeting with King, King chastised McCreight for using "loud language," and in that same meeting, King told McCreight that he would fire a loan closer (not MLOs, like McCreight) on the spot if they sent out a closing disclosure without approval from the underwriter.

- After McCreight admittedly made a mistake, Herring told McCreight that "for someone w/ 27yrs experience, she should know better."

- King and Herring spread a false rumor that McCreight had sued AuburnBank.

- Herring and other employees would talk about McCreight behind her back and disparage her such as by calling her "crazy."

- In a sales meeting, King told the attendees that his plan was to hire young originators and to "train them on the fast track," and then he introduced the young employees, saving McCreight for last.

- King ignored McCreight in several ways: (1) he avoided meeting her for over a month after he was hired as her supervisor, (2) he did not respond to McCreight's email apologizing about any miscommunication, and (3) he did not respond to McCreight's email asking to meet with him.

- McCreight was not "given the courtesy" of an invitation to a job fair and a meeting.

Assuming these statements and actions constituted harassment based on sex, which they are not, they are not sufficiently severe or pervasive to state a hostile work environment claim. First, the alleged conduct was not frequent. The conduct began sometime in October 2017, when King first met with McCreight, and continued until McCreight's termination in May 2018, eight months later. During this time period, McCreight has identified a handful of specific interactions that she perceived as harassment; however, a few comments over the course of several months cannot be said to be frequent or pervasive harassment. *See Allen v. Ambu-Stat, LLC*, 799 F. App'x 703, 708–09 (11th Cir. 2020) (holding five isolated comments spread over four months were not severe or pervasive). In fact, rather than being frequently harassed, one of McCreight's main complaints about her treatment at AuburnBank was how much King ignored her.

Second, the conduct was not severe, physically threatening, or humiliating. At worst, McCreight endured generic work-related criticisms, exclusion from certain work events, and unpleasant and offensive utterances (like the rumors about her having sued AuburnBank or being flippantly introduced to colleagues). This type of behavior is a far-cry from what courts have found to be severe, threatening or otherwise actionable harassment. *See Gupta v. Fla. Bd. of Regents*, 212 F.3d 571,

586 (11th Cir. 2000) ("All the sexual hostile work environment cases decided by the Supreme Court have involved patterns or allegations of extensive, long lasting, unredressed and uninhibited sexual threats or conduct that permeated the plaintiff's work environment."); *Stancombe v. New Process Steel LP*, 652 F. App'x 729, 734 (11th Cir. 2016) (per curiam) (discussing how two incidents of sexual assault within a week was not severe or pervasive harassment). Afterall, "Title VII is not a federal 'civility code.'" *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1245 (11th Cir. 1999) (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 118 (1998)).

And finally, McCreight herself has offered "no evidence that [s]he was hindered in the ability to do [her] job." *Camp v. HB&G Bldg. Prods., Inc.*, No. 2:17-cv-152-ECM, 2021 WL 1183792, at \*15 (M.D. Ala. Mar. 29, 2021); *cf. Olson v. Lowe's Home Ctrs., Inc.*, 130 F. App'x 380, 388 (11th Cir. 2005) (finding sufficient evidence that harassment interfered with the plaintiff's job where the plaintiff tried to avoid the harasser at work and plaintiff was unable to work at her previous level).

Looking at the conduct in the totality of the circumstances, and evaluating it against the pertinent objectivity factors, the Court concludes that no reasonable person could conclude that McCreight endured sufficiently severe or pervasive harassment so as to have created an actionable hostile-working environment. Summary judgment is due to be granted on this claim as to McCreight.

Wester's claim is essentially the same.  She cites the following conduct:

- King did not respect older people, as he would talk down to them, would not let them speak, was very arrogant and rude, and dominated conversations.

- During one of their first meetings, King made false accusations about Wester, put her on probation, and repeatedly told her he would fire her on the spot if she did certain things.

- King announced to the office that he was not there to make friends; he was there to clean house and clean up the mortgage department.

- Wester's performance reviews declined within the first month of King's hiring.

Under the totality of the circumstances, no reasonable jury could find that this conduct amounted to sufficiently severe or pervasive job-altering harassment to support an actionable claim.  *See King v. CVS Caremark Corp.*, 2 F. Supp. 3d 1252, 1262–63 (N.D. Ala. 2014) (granting summary judgment to hostile work environment claim because plaintiff only identified subjectively offensive comments that occurred without "specific frequency" over the course of about a year."); *see also Stancombe v. New Process Steel LP*, 652 F. App'x 729, 734 (11th Cir. 2016) (per curiam).

Like with McCreight, King's sporadic comments can be described as rude, unprofessional, and unpleasant, but this conduct is not severe or pervasive

harassment, let alone ageist or sexist harassment. Summary judgment is therefore due to be granted as to Wester's hostile work environment claims.

## E.     False Light Invasion of Privacy (Count V)[15]

McCreight also alleges that AuburnBank and King invaded her privacy by allegedly publicizing false information about her termination to the community at large. AuburnBank and King seek summary judgment, denying that they spread any information, let alone false information, about McCreight's termination.

In Alabama, the false light invasion of privacy tort exists when "[o]ne . . . gives publicity to a matter concerning another that places the other before the public in a false light" if the false light was "highly offensive to a reasonable person." *Butler*, 871 So. 2d at 12 (quoting *Schifano v. Greene County Greyhound Park, Inc.*, 624 So. 2d 178, 180 (Ala. 1993) (emphasis omitted)(quoting Restatement (Second) of Torts § 652E (1977)). While defamation only requires communication to a third person, false light invasion of privacy requires that the defendants give "publicity" to their false statements.   "Publicity" is defined by communicating the false statements "to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Ex parte Birmingham News, Inc.,* 778

---

[15] Wester voluntarily dismissed her invasion of privacy claim in her summary judgment response. (Doc. 124 at 96.)

So. 2d 814, 818 (Ala. 2000).  That is, communication to a "single person or even to a small group of persons" is insufficient for publicity. *Id.*

AuburnBank and King primarily rest their arguments on the "publicity" element, arguing that McCreight is unable to establish that either AuburnBank or King publicly made any false communications about McCreight.  In contrast, McCreight argues that AuburnBank told people in the banking and finance industry, including some of McCreight's customers and clients, that McCreight had been fired for misconduct. McCreight argues that it was these communications that gave "publicity" to the false information that McCreight was fired for misconduct.

To establish "publicity" McCreight must at least show that AuburnBank communicated false information to someone outside of the company. *See Butler,* 871 So. 2d at 21 (finding a communication to five people in the office of the city clerk to be insufficient to have given a matter publicity); *Pouncy,* 920 F. Supp. at 1583 (N.D. Ala. 1996) (finding no publicity where comments were allegedly only made within the confines of a company); *Rosen v. Montgomery Surgical Ctr.*, 825 So. 2d 735, 736 (Ala. 2001) (finding no publicity where statements were made to one co-worker who subsequently communicated it to at least two other co-workers).

But here, McCreight has failed to do so.  McCreight does not identify any individuals within AuburnBank that made false communications to the public. Rather, McCreight relies solely on speculation that AuburnBank must have told

36

individuals that she was fired for misconduct because word of McCreight's termination rapidly spread throughout the community. McCreight herself is unsure of who publicized information about her termination, and AuburnBank denies telling anyone that McCreight had been fired, just that she was no longer with AuburnBank. And while McCreight has presented no evidence that AuburnBank publicized any false information about McCreight or her termination, there is evidence that McCreight herself told outside individuals about her termination. As she stated when she left, "she would talk to every director" about what happened to her. (Doc. 122-26 at 25.)

Because McCreight has presented no evidence, aside from her own speculation, that AuburnBank publicized false information about her to individuals outside of AuburnBank, let alone truthfully told people that she was fired for misconduct, McCreight's invasion of privacy claim fails.

### F.    Negligent Retention/Supervision (Count VII)

Lastly, in Count VII, McCreight and Wester bring a claim of negligent retention, supervision, training and retention.  Such a claim requires that there be a viable underlying tort claim for which a defendant may be held liable due to its own negligence. *Potts v. BE & K Const. Co.*, 604 So. 2d 398, 400 (Ala. 1992); *see also Tison v. Alachua Straw Co. LLC*, 444 F. Supp. 3d 1344, 1359 (M.D. Ala. 2020); *Edwards v. Hyundai Motor Mfg. Alabama, LLC*, 603 F. Supp. 2d 1336, 1357 (M.D.

Ala. 2009). Because summary judgment is due to be granted in AuburnBank's favor on all other underlying tort claims, summary is due on this claim as well.

### VI.   CONCLUSION

Accordingly, it is hereby ORDERED that the Motion for Summary Judgment filed by AuburnBank, Auburn National Bancorporation, and Michael King (Doc. 121) is GRANTED.

DONE, on this the 7th day of July, 2022.

_____/s/ R. Austin Huffaker, Jr._____
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE